# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NANCY R. HOAG,
     Plaintiff,

     v.

CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS,
     Defendant.

CIVIL ACTION NO.
3:05cv1185 (SRU)

## RULING ON MOTION FOR SUMMARY JUDGMENT

This diversity action arises out of an employment dispute between Nancy R. Hoag and

Cellco Partnership d/b/a Verizon Wireless ("Verizon"). Hoag's Complaint sets forth three counts

that must be addressed.[1] First, Hoag accuses Verizon of discriminating against her on the basis

of her sex. Second, Hoag alleges that Verizon is responsible for false imprisonment under a

theory of respondeat superior. Third, Hoag claims that her suspension from February through

April 2005 was illegal retaliation in response to her filing a complaint with the Connecticut

Commission on Human Rights & Opportunities ("CCHRO"). Verizon now moves for summary

judgment on all three counts.

Verizon's motion raises four questions of law: (1) whether Conn. Gen. Stat. § 46a-82(e)

places a time-bar on events occurring more than 180 days prior to Plaintiff's complaint with the

Connecticut Commission on Human Rights & Opportunities ("CCHRO"); (2) whether a

reasonable jury could find for Hoag on her claim of sex discrimination under Conn. Gen. Stat. §

---

[1] Hoag's negligent infliction of emotional distress claim was dismissed by joint
stipulation of the parties dated April 18, 2007. Hoag's original complaint may also appear to
state a claim under respondeat superior for intentional infliction of emotional distress (IIED), but
Hoag, in her objection to Verizon's motion for summary judgment, has clarified that her
respondeat superior claim is limited to false imprisonment.

46a-60(a)(1) & (8); (3) whether Hoag has presented enough evidence to survive summary judgment on her respondeat superior claim; and (4) whether Hoag's claim of illegal retaliation under Conn. Gen. Stat. § 46a-60(a)(4) can survive summary judgment. I answer the first question in favor of Hoag, but I answer the three remaining questions in favor of Verizon. Accordingly, Verizon's motion for summary judgment is granted.

## I.      Summary Judgment Standard

Summary judgment is appropriate when the evidence on file demonstrates that "there is no genuine issue as to any material fact and that the moving part is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). To defeat summary judgment, the non-moving party must present significantly probative evidence demonstrating that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

A material fact concerns an essential element of the non-moving party's case, *id.* at 322-23, and affects the outcome of a suit, Anderson, 477 U.S. at 247-48. To present a genuine issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. The court construes the facts in the light most favorable to the non-moving party, and resolves all ambiguities and draws all reasonable inferences against the moving party. *Id.* at 255.

## II.      Factual Background

Hoag has worked at Verizon or its predecessors since 1992. (Hoag Dep. Tr. ("Hoag Tr.") 8-9.) In 1999, she became District Manager in the Indirect Channel, and she still holds that position today. (Hoag Tr. 9, 193.) Hoag reports to her Director, who reports to Verizon's

Regional President, Robert Stott. (Hoag Aff. ¶ 5.) There are five Directors who report to Stott, and during Hoag's employment with Verizon, none of the Directors has been a female. (Hoag Aff. ¶ 6.) Hoag's Director from 2000 until October of 2003 was Jim Whitney. (Hoag Aff. ¶ 7.) After Whitney left the company, Hector Rodriguez was transferred laterally to become Hoag's Director in October of 2003. (Hoag Aff. ¶ 13.)

On June 21, 2000, Hoag was riding in a car with Whitney and another co-worker when she offered an opinion on Verizon's public relations. (Pl.'s Objection to Def.'s Mot. for Summ. J. ("Objection") Ex. 9 at 2.) Whitney's response was to ask Hoag, "when are you going to realize that this company is run by big, fat, white men . . . and I am one of them?" (Hoag Aff. ¶ 8.) Hoag reported this incident to Verizon's Human Resource Department, but she was never told what the results of the investigation were, and Whitney remained her supervisor. (Hoag Aff. at ¶ 9.) Julie DeCosta, of Verizon's Human Resource Department substantiated Whitney's comments. (DeCosta Dep. Tr. ("DeCosta Tr.") 11-12.)

In Spring of 2002, Hoag was preparing for a presentation, and Whitney advised her that if she wanted to get the attention of the men at the presentation, she should take off her blazer, which Hoag understood to mean that she should expose her "physical attributes." (Hoag Aff. ¶ 10.) On January 8, 2003, Hoag, through counsel, complained to Stott about Whitney, and Verizon's response was to offer her a demotion at the same rate of pay. (Hoag Aff. ¶¶ 11-12.)

In October 2003, Rodriguez was transferred within the company to become Hoag's Director. (Hoag Aff. ¶ 13.) Prior to that transfer, Verizon had received complaints from five female employees about Rodriguez. (DeCosta Tr. 28-29.) The complaints regarded unfair quota distribution, and only some were substantiated by Verizon. (DeCosta Tr. 34.) There is no

indication in the record that any of those complaints alleged sex discrimination.

Hoag became dissatisfied with her working relationship with Rodriguez. Rodriguez would share information about new policies with Paul Ralston, who was Hoag's counterpart District Manager in Massachusetts. (Hoag Tr. 230.) Rodriguez and Ralston had offices near each other in the same building in Woburn, Massachusetts (Hoag Tr. 231), while Hoag's office was in Meriden, Connecticut (Hoag Tr. 52). Hoag would only hear about the new policies that Rodriguez shared with Ralston if they happened to come up in conversations between Hoag and Ralston. (Hoag Tr. 230.) Also, during a discussion with Hoag about a female employee who was unmarried and had no kids, Rodriguez said something along the lines of: "You women who have kids and are married . . . she doesn't have either. Therefore she can manage territories that are farther away." (Hoag Tr. 229-30.)

In March 2004, Hoag met with DeCosta to lodge her own complaint about Rodriguez. (DeCosta Tr. 26, 28.) DeCosta was able to substantiate Hoag's allegations that Rodriguez fell asleep during meetings, that he "changed the rules in the middle of the game," and that he misspoke or lied to his team. (DeCosta Tr. at 38.) The record does not indicate that Rodriguez behaved differently towards male and female employees. DeCosta's notes from her meeting with Hoag indicate that Rodriguez's actions were not harassing, not inappropriate, and not against the law. (Objection Ex. 12 at 2.)

On the morning of May 13, 2004 Hoag and Rodriguez interviewed job candidates in a hotel conference room until around 12:30 p.m. (Rodriguez Dep. Tr. ("Rodriguez Tr.") 50.) The interviews proceeded uneventfully. (Hoag Tr. 90, 92, 102.) Following those interviews, Rodriguez closed the door of the conference room after the last candidate left. (Hoag Tr. 103.)

The door did not have a lock. (Def.'s Mot. for Summ. J. ("Motion") Ex. 14 at 29.) Hoag felt uncomfortable being alone with Rodriguez, so she informed him of her discomfort and said she wanted to leave. (Hoag Tr. 105.) Rodriguez told Hoag she could not leave, and he commanded her to sit down and not to touch her computer or her cell phone. (Hoag Tr. 109.) Rodriguez was standing in front of the door, and Hoag believed she could not get by him to leave the room. (Hoag Tr. 109.) Hoag tried twice to touch her laptop and cell phone, and each time Rodriguez told her not to touch them. (Hoag Tr. 109.)

In the ensuing 35 or 45 minutes (Hoag Aff. ¶ 19), Rodriguez told Hoag that he had received complaints about her management style from her team (Hoag Tr. 107). Hoag believed Rodriguez was lying (Hoag Tr. 107), but Hoag's team members had complained that Hoag was not available to or supportive of them (DeCosta Tr. 54-55). During the meeting, Rodriguez used a very stern, strong voice, and pointed his finger at Hoag from across the conference room table. (Hoag Tr. 113, 122.) Hoag has a recollection that Rodriguez referred to her as a woman at some point during the meeting, perhaps while discussing her ability to handle the stress of working while also dealing with her mother's terminal illness. (Hoag Tr. 128.) Hoag finally got up and left the room when Rodriguez was coming around the conference room table, apparently distracted by a call on his cell phone. (Hoag Tr. 123-25.) Hoag either placed or received a phone call as she was leaving the room. (Hoag Tr. 124.)

After the meeting, Hoag had phone contact with a few Verizon employees. Roseanne Lombardo reported that Hoag was crying hysterically and seemed scared when they spoke, and that Lombardo had never heard Hoag in such a condition. (Lombardo Dep. Tr. ("Lombardo Tr.") 14-16.) Christopher Burke said that Hoag was in deep distress and very terrified, and that he had

never heard a human being on the phone like that before. (Burke Dep. Tr. ("Burke Tr.") 16-17.) Hoag also called her doctor, who reported that she was very upset. (Banatoski Dep. Tr. ("Banatoski Tr.") 71.)

Hoag went on a medical leave of absence immediately after the incident with Rodriguez.[2] (Hoag Aff. ¶ 22.) Hoag reported the incident to Julie DeCosta in Verizon's human resources department on May 20, 2004 and described it as "two hours of mental torture." (Hoag Tr. 397.) In actuality, the meeting with Rodriguez lasted no longer than 45 minutes. (Hoag Aff. ¶ 19.) Hoag also filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") on July 1, 2004. (Motion Ex. 11.) Finally, Hoag filed a complaint with the Sturbridge Police Department on July 27, 2004, alleging that Rodriguez had held her against her will. (Motion Ex. 12.)

Hoag returned from her leave of absence on November 15, 2004 on the condition that she would not have to meet with Rodriguez alone (Motion Ex. 13), and there were no further instances of Rodriguez acting inappropriately toward Hoag (Hoag Tr. 407).

On February 4, 2005, criminal charges against Rodriguez were dismissed. (Motion Ex. 14 at 1.) On the following day, Hoag was suspended with pay (but without commission) while Verizon investigated the accuracy of allegations she made against Rodriguez. (DeCosta Tr. 68, 86.) The company found inaccuracies in her allegations, but no deliberate misrepresentation (Stott Dep. Tr. 21-25), and Hoag returned to work in April 2005 (DeCosta Tr. 86).

## III. Discussion

---

[2] There is some evidence in the record that Hoag lost responsibility for geographic territory during her leave of absence, but Hoag does not rely on that evidence to support any of her claims.

A.    Effect of Conn. Gen. Stat. §46a-82(e)[3]

Verizon argues that Conn. Gen. Stat. § 46a-82(e) bars this court from considering any acts that occurred more than 180 days prior to July 1, 2004, the date Hoag filed her complaint with the CCHRO.  If Verizon is correct, I may not consider comments made by Hoag's supervisor in 2000 and 2002 when deciding whether to grant summary judgment against Hoag on her employment discrimination claims.

The Connecticut Supreme Court has held that the 180-day limitation period of section 46a- 82(e) bars a plaintiff's recovery for acts occurring outside of the limitation period.  The limitation does not prevent a plaintiff from relying on events prior to the 180-day window to show that there is a continuing violation in the workplace, so long as some acts contributing to the violation do occur within the limitation period.  *State v. Comm'n on Human Rights and Opportunities*, 211 Conn. 464, 472-73 (1989).  The U.S. Supreme Court, interpreting a similar provision in Title VII,[4] has similarly held that Title VII's statute of limitations does not bar a court from considering events that occurred prior to the statutory window when faced with a complaint of hostile work environment.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).  The *Morgan* Court reasoned that a hostile work environment is not a series of single events, but rather one continuous and persisting event.  I conclude that as long as a complaint is

---

[3] Conn. Gen. Stat. §46a-82(e) provides in relevant part:  "Any complaint filed pursuant to this section must be filed within one hundred eighty days after the alleged act of discrimination . . . ."

[4] The Connecticut Supreme Court has said that Connecticut courts look to federal precedent for guidance in enforcing Connecticut's anti-discrimination statutes because of the similarities between the two statutes.  *State v. Comm'n on Human Rights and Opportunities*, 211 Conn. 464, 470 (1989); *Levy v. Comm'n on Human Rights and Opportunities*, 236 Conn. 96, 103 (1996).

filed within 180 days of any event contributing to the hostile workplace, it is timely, and damages

can be awarded based on all acts contributing to the hostile workplace.

Therefore, acts occurring prior to January 1, 2004 may not be used to support Hoag's

adverse employment action claims, because those claims are based on single events rather than

on continuing violations.  However, I may consider acts occurring prior to January 1, 2004

insofar as they relate to Hoag's hostile work environment claim.

B.      *Prima Facie* Case of Discrimination

Hoag alleges that Verizon has illegally discriminated against her in violation of Conn.

Gen. Stat. § 46a-60(a)(1) & (8).[5]  The legal standards applicable to each of the pertinent

subsections are sufficiently different to justify separate discussion.

1.      *Adverse Employment Decision*

Hoag's essential claim under Conn. Gen. Stat. § 46a-60(a)(1) is that she suffered an

adverse employment action as a result of sex-based discrimination by Verizon.  In determining

---

[5] Conn. Gen. Stat. §46a-60 provides in relevant part:
   (a) It shall be a discriminatory practice in violation of this section:
      (1) For an employer, by the employer or the employer's agent, except in
      the case of a bona fide occupational qualification or need, to refuse to hire
      or employ or to bar or to discharge from employment any individual or to
      discriminate against such individual in compensation or in terms,
      conditions or privileges of employment because of the individual's . . . sex
      . . . .

      (8) For an employer, by the employer or the employer's agent, . . . to harass
      any employee . . . on the basis of sex.  "Sexual harassment" shall, for the
      purposes of this section, be defined as any unwelcome sexual advances or
      requests for sexual favors or any conduct of a sexual nature when . . . (C)
      such conduct has the purpose or effect of substantially interfering with an
      individual's work performance or creating an intimidating, hostile or
      offensive working environment . . . .

whether a plaintiff has provided sufficient evidence of sex-based discrimination, the court must apply the *McDonnell-Douglas* burden-shifting analysis. *Dickenson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 431 F. Supp. 2d 247, 255-56 (D. Conn. 2006). Under the burden-shifting analysis, the plaintiff bears the initial burden to prove a *prima facie* case. *Id*.

To establish a *prima facie* case of an adverse employment action, a plaintiff must show that "(1) she belonged to a protected class, (2) she was qualified for the position she held, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Jackson v. Health Res. of Rockville, Inc.*, 357 F. Supp. 2d 507, 514 (D. Conn. 2005).

"Once a plaintiff has established a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. Upon the articulation of such a nondiscriminatory reason for the employment action, the presumption of discrimination that arose with the establishment of the *prima facie* case drops out, and the burden shifts back to the plaintiff to fulfill [her] ultimate burden of proving that the defendant intentionally discriminated against [her] in the employment action." *Dickenson*, 431 F. Supp. 2d at 255 (citations omitted). In order to satisfy her burden, the plaintiff may prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. *Id*. at 255-56.

When applying the burden-shifting analysis to a summary judgment motion, courts must remember that discrimination will more often be proven by circumstantial evidence than by direct evidence. "In discrimination cases where state of mind is at issue, the Second Circuit

affirms a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination. However, the mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." *Jackson*, 357 F. Supp. 2d at 513 (internal quotation marks omitted).

Hoag alleges two distinct occurrences that could qualify as adverse employment decisions. First, Hoag's six-month medical leave without pay, which followed closely on the heels of her meeting with Rodriguez in the hotel conference room, may be analogous to a constructive discharge and thus qualify as an adverse employment decision. Second, Hoag's suspension with pay but without commission for approximately two months following the dismissal of criminal charges against Rodriguez may also qualify. In both of these instances, Verizon does not contest that Hoag has met the first two elements of her *prima facie* case: 1) that she is a member of a protected class, and 2) that she was qualified for her position. The two elements in dispute are whether Hoag indeed suffered adverse employment actions, and if so, whether those actions were motivated by discriminatory intent.

Dealing first with Hoag's six-month medical leave, it is evident that this can be an adverse employment action only if it is similar to a constructive discharge. In other words, Hoag's medical leave is actionable only if she can show that Verizon forced her to take it. Constructive discharge is recognized in Connecticut to protect an employee who is forced to involuntarily resign as a result of an intolerable work atmosphere intentionally created by her employer. *Brittell v. Dept. of Correction*, 247 Conn. 148, 178 (1998). "Working conditions are intolerable

if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Id*.

In *Brittell*, the Connecticut Supreme Court held that there was no constructive discharge when an employee of the Department of Correction went on permanent medical leave after her co-workers and prison inmates repeatedly referred to her as a lesbian and a "half-man" over a two-year period.  *Id*. at 156.  The court decided that although the employee's working conditions had grown intolerable, she was not constructively discharged because she was given the chance to transfer to another prison where sexual harassment was less likely.  *Id*. at 179.  If her choice had been between continuing work at the same prison or resigning, then she might have been constructively discharged.  *Id*.

Similarly, in this case, Hoag has not provided enough evidence to permit a reasonable jury to find that she had been constructively required to take medical leave.  Hoag's decision to go on unpaid medical leave followed within a day of her meeting with Rodriguez.  Although the proximity of the medical leave to the meeting suggests some causal connection, there is no evidence from which a reasonable jury could conclude that Verizon forced her either to take leave or to continue working with Rodriguez.  For reasons discussed in section III. B. 2, Hoag has not come forward with sufficient evidence for a jury to find that her workplace had grown intolerable, and thus that she had been constructively required to take medical leave.

Even assuming, *arguendo*, that Hoag's workplace was intolerable, there is no evidence to show that her only choice was to go on medical leave.  There is no indication that Hoag asked Verizon to give her a new supervisor after her meeting with Rodriguez, nor did Hoag request that she be transferred.  Perhaps most fatal to Hoag's claim is that the record shows that when she

returned from medical leave, it was conditioned on the fact that she would not have to meet alone with Rodriguez in the future. There is no evidence that Verizon was unwilling to work with Hoag to make suitable arrangements at the time she took medical leave. Thus, no reasonable jury could find that Verizon was responsible under a theory analogous to constructive discharge.

Because Hoag has not offered evidence sufficient to prove the third element of her *prima facie* case (that she suffered an adverse employment action), it is not necessary to apply the rest of the burden-shifting analysis to her six-month medical leave.

Hoag also claims that her two-month suspension with pay but without commission constituted an adverse employment action. Here she is correct. The fact that Hoag's suspension resulted in loss of commission is enough to allow a reasonable jury to conclude that she has suffered an adverse employment action.

There is also enough evidence in the record that a reasonable jury could find that Hoag's suspension occurred under conditions giving rise to an inference of discriminatory intent: Stott has not had a female director during Hoag's employment, Rodriguez shared more information with Hoag's male counterpart than he shared with her, Rodriguez subjected Hoag to a closed-door meeting to give her a performance evaluation, while Hoag's male supervisors do not appear to have been subjected to such treatment as a result of complaints against them.

Because Hoag has met the burden of providing enough evidence for a reasonable jury to find that she has proved her *prima facie* case, the burden shifts to Verizon to provide a non-discriminatory justification for the suspension. In this case, the non-discriminatory justification concerns the need to investigate potentially false statements Hoag made to law enforcement authorities about her supervisor. It is undisputed that Hoag initially told police and

Verizon's human resources department that her meeting with Rodriguez lasted over two hours. Hoag also alleged that Rodriguez had locked the door to the conference room. These were both serious allegations, but neither one proved true. Verizon has asserted that it suspended Hoag in order to investigate the factual inconsistencies in her previous statements. Furthermore, once Verizon completed its two-month investigation and found that Hoag's charges were not intentionally false, it reinstated her. Therefore, the record establishes a non-discriminatory justification for Verizon's actions: Hoag was suspended because she had made misstatements of fact in a complaint against a co-worker.

Having offered evidence of a non-discriminatory justification for the suspension, Verizon has rebutted the presumption of discriminatory intent. It is now Hoag's burden to prove that Verizon actually acted out of discriminatory intent using the non-discriminatory justification as a pretext, and Hoag has not met this burden. There is nothing in the record to show that Hoag was treated differently from similarly-situated males, or that Verizon had a policy of discrimination. Hoag has shown that Stott, who authorized her suspension, has not hired a female director during Hoag's employment, but this evidence alone is of little value in the absence of a showing that any woman applied for such a position and was turned down. Also, Hoag has not offered evidence that Rodriguez played any role in the decision to suspend her, so any evidence tending to establish that he harbored a discriminatory intent, if it existed, would be inapposite to this analysis.

Although courts must be reluctant to grant summary judgment in favor of a defendant because of the inherent difficulties in proving discriminatory intent, there must be more than a scintilla of evidence in favor of Hoag's position. In light of Verizon's proffered

non-discriminatory justification for the suspension, there is nothing in the record before the court that would allow a reasonable jury to conclude that illegal discriminatory intent contributed to the decision to suspend Hoag.

Therefore, both of Hoag's bases for her claim of illegal discrimination under Conn. Gen. Stat. § 46a-60(a)(1) fail as a matter of law, and summary judgment must be entered in favor of Verizon on this count.

### 2.    *Hostile Work Environment Claim*

Hoag seeks to state a claim of sexual harassment based on allegations that Verizon has maintained a work environment that is hostile and abusive toward her.  Under Conn. Gen. Stat. § 46a-60(a)(8), "to establish a claim of hostile work environment the workplace must be permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Brittell v. Dept. of Correction*, 247 Conn. at 166-67 (internal quotation marks omitted).  "In order to be actionable, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  Whether an environment is sufficiently hostile or abusive is determined by looking at all the circumstances." *Id*. at 167 (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998)).  The Second Circuit has determined that workplace situations are discriminatory under a hostile work environment theory "where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex." *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001).

Still, "a plaintiff pursuing a hostile work environment claim must establish a basis, rooted in common law agency principles, on which to hold an employer liable for the conduct of its employees." *Brittell*, 247 Conn. at 167 (quoting *Gallegher v. Delaney*, 139 F.3d 338, 348 (2d Cir. 1998)). "Once an employer has knowledge of a racially or sexually combative atmosphere in the work-place, he or she has a duty to take reasonable steps to eliminate it." *Id*. at 168 (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir. 1986)). "[R]easonableness depends among other things on the gravity of the harassment alleged." *Id*. (quoting *Torres v. Pisano*, 116 F.3d 625, 638 (2d Cir. 1997)).

Considering all the circumstances, Hoag has not demonstrated that a reasonable jury could find that she was subjected to a hostile workplace. The two comments by Whitney occurred two years apart, and although both were inappropriate in a professional setting, neither one was particularly intimidating, insulting, or discriminatory. Nor were they physically threatening or humiliating. *See Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993) (courts must consider whether allegations of hostility are based on conduct that is "physically threatening or humiliating, or a mere offensive utterance"). Similarly, Rodriguez's comment that women who are married and have kids cannot travel did not meet the standard set by case law.

The fact that Rodriguez shared more information with Ralston than with Hoag does not contribute to a hostile work environment. Additionally, although it is true that five women had raised complaints against Rodriguez, none of those complaints alleged any sexually inappropriate conduct. Nor has Hoag demonstrated that Rodriguez treated male subordinates differently from those women.

Hoag also complained to human resources that Rodriguez lied, changed the rules in the

middle of the game, and fell asleep during meetings. Although those complaints may very well demonstrate that Rodriguez was incompetent, they do not demonstrate that he created a hostile working environment for Hoag. The complaints also do not show that Rodriguez acted that way only towards women, so his actions do not support an inference of discriminatory intent. Importantly, DeCosta's notes from her meeting with Hoag show that Rodriguez's conduct was not inappropriate or harassing.

Finally, we are left with Hoag's meeting with Rodriguez at the hotel in Sturbridge. Although it is true that a single event, standing alone, can be sufficiently severe to constitute a hostile work environment, Hoag's meeting with Rodriguez does not rise to the required standard. Hoag relies on *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), to show that a single event can create a hostile work environment. That case has little bearing here, because the single act in *Tomka* was the rape of the plaintiff by three male co-workers.

Taking Hoag's factual allegations as true, her meeting with Rodriguez occurred behind closed doors for about 45 minutes. Hoag felt uncomfortable and asked to leave, but Rodriguez did not threaten her, he never touched her, and he did not make any inappropriate sexual remarks during the meeting. The content of the discussion focused on complaints that Rodriguez had received from Hoag's teammates. Although Hoag believed Rodriguez was lying during the meeting, Verizon was able to verify that its human resources department had received complaints about Hoag's performance. That single job performance evaluation, although uncomfortable for Hoag, simply cannot support a hostile work environment claim.

Finally, even if Rodriguez had created a hostile work environment for Hoag, there must be some basis for holding Verizon responsible. Hoag has not shown that Verizon failed to make

a reasonable response to her complaints about the meeting.  Instead, the record shows that Verizon did investigate Hoag's complaints against Rodriguez, and it shows that Hoag was allowed to return to work after her six-month medical leave with the concession from Verizon that Hoag would not again have to meet alone with Rodriguez.

The evidence Hoag has provided would not allow a reasonable jury to find that a reasonable person in Hoag's position would find her work environment abusive.  Therefore, summary judgment must be granted in favor of Verizon on this count.

C.    False Imprisonment Claim

"False imprisonment is the unlawful restraint by one person of the physical liberty of another." *Berry v. Loiseau*, 223 Conn. 786, 820 (1992).  The unlawful restraint must be "done for the purpose of imposing a confinement or with knowledge that such confinement will, to a substantial certainty, result from it."  Restatement (Second) Torts § 35; *see also Rivera v. Double A Transp.*, 248 Conn. 21, 31 (1999) (same).  Moreover, the alleged wrongful act must be accomplished through the use of force, either express or implied.  *Berry v. Loiseau*, 223 Conn. at 821.

Hoag attempts to hold Verizon responsible, under a theory of respondeat superior, for a false imprisonment allegedly committed by Rodriguez.  Verizon has not disputed that it would be liable under respondeat superior, but it has focused on demonstrating that there was no false imprisonment.  Assuming that Rodriguez was acting within the scope of employment, and that Verizon can be held liable for his actions, I deal only with whether Rodriguez's actions constitute false imprisonment.

Hoag's false imprisonment claim cannot survive summary judgment.  Although Hoag has

demonstrated that her meeting with Rodriguez occurred against her will, she has not shown that he intentionally confined her by force or threat of force. At all times the conference room door was unlocked. Rodriguez may have been standing between Hoag and the door, but there is no allegation that he exerted any force on the door or that he physically restrained Hoag. Furthermore, the one time that Hoag did attempt to get up to leave the room, she was successful and encountered no impediment.

Likewise, Hoag has not shown that Rodriguez used force indirectly, through a threat or otherwise. The record shows that Rodriguez spoke in a strong and stern voice and pointed his finger at Hoag during the meeting, but he was always at least a few feet away from her. Rodriguez also told Hoag not to move, but this instruction was not coupled with any threat of what might happen if Hoag did move. In fact, Hoag did not once ask what would happen if she left the room. While it may have been unpleasant for Hoag to receive negative feedback behind closed doors from a stern supervisor, no reasonable jury could find that use of a strong voice and finger pointing by a supervisor evaluating a subordinate's performance, absent more, was a threat of force. Therefore, Verizon's motion for summary judgment must be granted on this count.

D.     Retaliation Claim

The elements of a claim of illegal retaliation under Conn. Gen. Stat. § 46a-60(a)(4)[6] are

_____

[6] Conn. Gen. Stat. § 46a-60(a)(4) provides in relevant part:
(a) It shall be a discriminatory practice in violation of this section:
. . . .
(4) For any person [or] employer . . . to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84.

the same as those of a claim of retaliation under Title VII. *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 642 (D. Conn. 2005). To establish a *prima facie* case for retaliation under Title VII an employee must show: (1) that she participated in a protected activity known to the defendant; (2) that her employer took an employment action disadvantaging the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Id.* at 641.

A causal connection may be established either "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (quoting *DeCintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).

It is undisputed that Hoag has met the first element of a *prima facie* case for illegal retaliation. Hoag's filing of a complaint with the CCHRO qualifies as protected conduct. It is also evident that Hoag has met the burden of proving the second element of her *prima facie* case. Hoag's suspension for two months with pay but without commission obviously disadvantaged her because her compensation for those two months was reduced from what it would have been if she had been working.

However, Hoag has not met the third element of her *prima facie* case because the record does not include evidence of a causal connection between Hoag's filing of a complaint and her suspension. First, Hoag has not shown that any other employee engaged in similar conduct and was treated differently. Hoag argues that the fact that Rodriguez was found to have lied to

employees and merely received counseling shows disparate treatment. However, Rodriguez's misstatements to employees are far less serious than Hoag's misstatements in criminal and civil proceedings against her superior. Furthermore, Hoag's misstatements were not protected conduct. The only protected conduct was the *filing of the complaint*, and Hoag has not shown that any other Verizon employees engaged in similar conduct and were treated differently.

Nor has Hoag shown anything that could give rise to an inference of retaliatory animus on the part of Verizon. Rodriguez played no role in Hoag's suspension. There is nothing to suggest that Stott and DeCosta harbored retaliatory intent when they decided to suspend Hoag. Instead, the record shows that Verizon justified the suspension by its desire to investigate serious inconsistencies in Hoag's criminal complaint and internal allegations against Rodriguez, and Hoag has not demonstrated that this justification is mere pretext.

Finally, a causal connection can be inferred when the retaliatory action occurs in close proximity to the protected activity, but in this case, Hoag was not suspended until more than seven months she filed her complaint. As a matter of law, that time-lapse is too long to give rise to an inference that the suspension was in retaliation for Hoag's filing of a complaint with the CCHRO. *See Hussein v. Hotel Employees & Rest. Union, Local 6*, 108 F. Supp. 2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months defeats any retaliatory nexus"); *Ponticelli v. Zurich American Insurance Group*, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two and one-half months between protected activity and allegedly retaliatory act is insufficient).

Therefore, Hoag has failed to come forward with sufficient evidence to support a jury finding in her favor. Accordingly, Verizon's motion for summary judgment must be granted on this count.

IV.     **Conclusion**

Verizon's motion for summary judgment **(doc # 39)** is GRANTED on all counts.  The

clerk shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 27th day of September 2007.

/s/ Stefan R. Underhill
                Stefan R. Underhill
                United States District Judge